It appeared upon the record in this cause that on the 3d day of August, 1807, John Gilliam made an entry of 200 acres, his occupant claim. That on the same 3d day of August, 1807, Daniel Morris made an entry of 200 acres, his occupant claim. That the number of Gilliam's entry was 15, and the number of Morris's entry 33. That Morris caveated the entry of Gilliam, which was certified by the principal surveyor to the County Court of Franklin, removed from thence by certiorari
to the District Court of Winchester, and transferred from thence to the Circuit Court of Franklin county. And at the August term of said court, 1814, a jury found the following facts; to wit, "that no conditional line was agreed to by the parties." And the following facts were agreed on by the counsel, "That in February, 1806, the caveatee, who resided in East Tennessee, came to see the country, and was on the land in controversy after the caveator had been on it, and had put the initials of his name on a tree, cut some poles at it, and directed his son John and a Mr. Deloach to build him a cabin on said land. That on the 20th of February, 1806, and before any cabin was built, the caveator, who resided on Stone's River, returned to the place, and cut a set of house logs, made rails, built a pen, and sowed some seed in it, and cleared about three-quarters of an acre of land. That John Gilliam, jun., afterwards went there and built a cabin with the logs that the caveator had cut. That about the 20th of March, 1806, the caveator moved with his family upon the land, and found John Gilliam, jun., living in the cabin. That the caveator moved into the cabin with the said John Gilliam, jun.: that they afterwards fell *Page 166 
out, and the caveator was compelled, by the superior force of the said John Gilliam, jun., to move between 80 and 100 yards to the place where he claims his preference right. That the caveator was seated on and in actual possession of the place where he now lives at and before the 1st of May, 1806, which place and the improvements thereon, made on the 1st day of May, 1806, was in the centre of his survey. That the caveator's survey includes the land in controversy. That before the caveator left the cabin built by John Gilliam, jun., to wit, on the 10th of April, 1806, his brother, Lemuel Gilliam, came out with a negro of his father's, and lived that summer with his brother John in said cabin, and made corn there, and at another place about a quarter of a mile off. That John Gilliam, jun., had another improvement about three-quarters of a mile off, which he afterwards sold. That the caveatee resided in East Tennessee till January, 1807, when he moved to the cabin his son John had built, and enjoyed the benefit of the crop made by his son Lemuel at that place. That John Gilliam, jun., claimed the land where the cabin was, under a grant to Russell, and agreed with the caveator, when the caveator left the cabin built by said John, that if he did not establish his claim under the grant, he, John, would relinquish all his right of a preference to the caveator. That the said Lemuel was under age, and the work he did was for his father; and that he claimed no right of occupancy for himself. That the caveatee's improvement was not included in the centre of his survey. That Lemuel Gilliam was seated on and in actual possession of the place where the cabin was, at and before the 1st day of May, 1806, under the direction of the caveatee aforesaid."
It further appeared from the record that the interference of the two tracts amounted to 57 acres, 105 square poles. That at the February term of said court, upon the above case and the argument of *Page 167 
counsel, it was ordered by the Court that the caveat be dismissed, and the caveatee recover his costs, c., from which judgment the caveator took his appeal in nature of a writ of error to this court. Three points were made in this case by the counsel. First, whether the circumstances of the occupant, anterior to the 1st day of May, 1806, could be taken into view. Secondly, whether the caveatee comes within the Act of 1806, c. 3, sec. 2. Thirdly, how the survey in this case should be made. First, whether the circumstances anterior to the 1st day of May, 1806, can be taken into view. It is considered that they can not, for previous to this time the legislature seems to have taken no notice of them by considering them trespassers before that time, or as having performed meritorious services; and it would be foreign to the spirit of the act to take into consideration the agreements, contracts, or disputes of the parties in relation to their claim under the same, as thereby particular cases might be brought into view, to the exclusion of general principles, on which, in contemplation of law titles should always depend. Secondly, whether the caveatee comes within the Act of 1806, c. 3, sec. 2. The act says that "any person or persons who have seated him, her, or themselves on any vacant and unappropriated land within the jurisdiction of this State, and who were in actual possession of the same at or before the 1st day of May, in the present year," c. It is contended, according to the true construction of these words, the caveatee, John Gilliam, is not comprehended; that he can not be considered as a person who may have seated himself on vacant lands, c., and in actual possession, but negative the idea of being in possession by a son, servant, agent, or other person on his behalf. If this be the true construction, to what length would it go? It would go this length, it is conceived: that if he were not in actual possession by his person on that day, as if he were goine to court, muster, or upon other business off the *Page 168 
premises, he would not satisfy the law, notwithstanding his possession was continued by his family if he had one, by his servants, if he had any, and by his property, if he had neither. But the act could not mean the corporeal possession before stated as being the qualification upon which the benefit of the act depended, as thereby its operation might be narrowed by accident, and its extent limited by contingency, in direct opposition to the manifest scope and intention of the act. The object perhaps was to give the preference to those who had taken possession with a view to the making of a crop on the land that season; and actual possession on the 1st day of May was considered as sufficient evidence of that intent. Now what kind of possession evidenced this intent? A possession by a part of a man's family would be as conclusive of this as that of the man himself, especially such a part of his family as the law considers under his direction and control, as an infant son, a servant, whose services he is entitled to command, and the benefits and product of them to receive. In this case, the caveatee's son Lemuel, being under age, having come there with his father's negro, and being there at and before the 1st of May, 1806, and having the same season made a crop which was enjoyed by the caveatee on the premises, is considered an actual possession by the caveatee within the Act of Assembly. But the case cited at the bar, from Kingston, of John Smith T. is considered as having decided the principle of the present case. There the Court looked into the nature of the possession of Smith's tenant, and, finding it a tenancy, rejected his claim. This settles the present case, for if authorizes us to look into the possession of Lemuel Gilliam, and the moment we do this we tease to hare a doubt, upon the facts agreed, who is in actual possession. The caveatee is entitled on another ground, which I will barely mention. From the relationship between the son Lemuel and his father in this case, the *Page 169 
infancy of the son, the residence of the father's negro with the son, and the subsequent enjoyment of the crop and premises by the father, he may be considered as the assignee of the son under the act, and in this way entitled to a right of occupancy. In adverting to the facts agreed upon in this case, it seems that both these parties are in such an actual possession as to entitle each to the benefit of a right of occupancy, by virtue of his possession, to a distinct spot, which not being at a sufficient distance from that of the other to permit the survey of each to be in a square, with the improvement in the centre, without interference, it seems a question which shall give place, and raises a third point in this cause, — how the survey is to be made? This depends on the same Act of 1806, c. 3, sec. 2, which says, "such occupant shall include his improvement in the centre of a square." The caveatee, having the elder entry, has the prior right of survey. But the caveator says that the caveatee has not, in this case, surveyed according to the requisition of the act, by placing his improvement in the centre and running his lines equidistant therefrom, so as to include the quantity given by the entry, but has surveyed in such a manner as to place his improvement between the centre of his survey and the caveator's claim, by which the interference is rendered much less than if he had surveyed by placing his improvements in the centre; and the caveator objects to this, and says that, as the caveatee has not pursued the act, the survey is void. To this it is answered that it is true the survey should pursue the act and be conformable thereto, otherwise it is void as far as it deviates therefrom; that is to say, by including land not warranted by the act, to the extent of such unauthorized included part, but no further. And the survey in this case, including the unauthorized part not on the side of the caveator but on the other side the most remote from him, thereby receding from, instead of encroaching upon, *Page 170 
the caveator, he is not thereby injured, and without an interest in him is not competent to raise the objection. I am for affirming the judgment of the Circuit Court.